IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

REGINALD E. JARVIS :
:
v. :
: Civil No. CCB 05-2950
MICHAEL J. ASTRUE, :
Commissioner :
Social Security Administration :

**MEMORANDUM**

This is an employment discrimination case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), in which Reginald Jarvis ("plaintiff" or "Mr. Jarvis"), an African American male employed by the Social Security Administration ("SSA"), claims he was not selected for promotion to a building manager position because of racial discrimination. Now pending before the court is a motion for summary judgment filed by Michael J. Astrue, SSA Commissioner ("defendant", "Commissioner" or "Mr. Astrue") on February 20, 2007. The motion has been fully briefed, and pursuant to Local Rule 105.6, no hearing is necessary. For the reasons stated below, the defendant's motion will be granted.

**BACKGROUND**

Mr. Jarvis began working for SSA in July 1992 as a motor vehicle operator, a wage grade 6 position. He moved quickly up the employment ladder, becoming an environmental health technician, general schedule ("GS") 7 in April 1997, then a safety and occupational health specialist, GS-9, in September 1998, and finally reaching GS-11 in September 2000, where he

1

continued to serve as a safety and occupational health specialist.[1]  In October 2001, Mr. Jarvis applied for a building manager position (GS-12; "management analyst" category).  The application process consisted of two parts: submission of a paper application followed by an interview for candidates meeting certain criteria.

After his written application was reviewed, Mr. Jarvis was one of five people (two African American, three white) whom SSA's personnel staff deemed to have met the minimum qualifications necessary for the position, which included holding a GS-11 position or its equivalent.  These five applications were placed on a "well-qualified list" (sometimes referred to as a "best-qualified list") and then evaluated by a four person assessment panel at the Office of Facilities Management ("OFM").  The panel's membership was divided equally between management and bargaining unit representatives.  One of the management-side panelists was John Larwood, then OFM's Branch Chief for the Division of Main Complex Management and a former building manager, who later served as an interviewer as well.  Mr. Jarvis received the highest score of the five applicants at 97 points, and Christopher Sulewski, a white male who was eventually selected for the position, was part of a three-way tie for last place with 70 points.

During the interview phase, candidates met with Mr. Larwood and John Shryock, then OFM's Director of Main Complex Management, both of whom are white males.  Mr. Shryock had supervised Mr. Jarvis previously.  Candidates were asked a list of questions with respect to the position's functions and their relevant experience.  Topics included preventive maintenance, asbestos, and contracts.  Mr. Jarvis's responses generally track the model answers compiled by

---

[1] Mr. Jarvis was promoted to safety and occupational health specialist at GS-12 in October 2004, after the events giving rise to this case occurred.

Messrs. Larwood and Shryock, as do Mr. Sulewski's. (Def.'s Mot. Summ. J. [hereinafter "Def.'s Mot."], Exs. 12 & 13.) Both candidates performed well, according to the interview notes taken by Mr. Larwood,[2] however, he documents a more favorable reaction to Mr. Sulewski, commenting on his work experience as a pipefitter leader that directly bore on the building manager position, as well as his communication and leadership skills. (Def.'s Mot., Ex. 13.) In contrast, Mr. Larwood notes that Mr. Jarvis "[l]acks facilities knowledge" and would have a "[learning] curve [that] could be damaging." (*Id.*) Following the interviews, Messrs. Larwood and Shryock submitted evaluations of each candidate to Andria Childs, an African American woman, then Associate Commissioner of OFM and in charge of selection for the building manager position. (Def.'s Mot., Ex. 19, Decl. Andria Childs [hereinafter "Decl. Childs"] ¶ 7.) These evaluations were designed to make Mr. Larwood and Mr. Shryock's preferences among the candidates evident, however, Ms. Childs had the responsibility for making the actual decision. (Def.'s Mot., Ex. 18, Decl. John Shryock [hereinafter "Decl. Shryock"] ¶ 6.) Ms. Childs chose Mr. Sulewski to fill the position on April 7, 2002 based on these evaluations and "the selection package (consisting of the Vacancy Announcement, Applications, and copy of the interview questions and answers)." (Decl. Childs ¶¶ 3, 7.) She explains: "Mr. Jarvis was a Safety and Occupational Health Specialist. His experience was limited to health and safety issues. In contrast, Mr. Sulewski was a Pipe-Fitter/Plumber and, as a result, had broader experience in the mechanical operations and infrastructure of HQ [presumably "headquarters"]

---

[2] Mr. Jarvis asserts that the interview notes were not introduced at the arbitration, while the Commissioner maintains they were introduced as joint exhibit 4. Mr. Larwood has provided an affidavit identifying them as the interview notes that he took. (Def.'s Mot., Ex. 17, Decl. John Larwood [hereinafter "Decl. Larwood"] ¶ 5.) Regardless of their introduction (or lack thereof) during arbitration, I will accept them as authentic.

buildings." (*Id.* at ¶ 8.)

There is some confusion surrounding the evaluations sent to Ms. Childs.  Two versions exist, one labeled "Summary Evaluation" [hereinafter "Summary"] (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. [hereinafter "Pl.'s Opp'n"], Ex. 5), the other "Recommendation for GS-12 Management Analyst, Announcement Number W-1134" [hereinafter "Recommendation"] (Def.'s Mot., Ex. 14).[3]  Both the Summary and the Recommendation convey the same essential information about Mr. Jarvis and Mr. Sulewski, and the parties seem to agree that Ms. Childs received one of them, thus both are excerpted here.  The evaluations of Mr. Jarvis and Mr. Sulewski are as follows:

> In 1997 [,] Reginald was assigned to the Management and Safety Staff as a GS-7 Environmental Technician.  Since then, Mr. Jarvis has been promoted to a GS-11 Safety and Occupational Health Specialist (SOHS).  As an SOHS, he has gained some understanding of the mechanical system throughout the complex, as well as with the Shop locations, and their basic functions.  Reggie lacks knowledge of the preventive maintenance programs of each shop and of many of the shops' responsibilities.  Reginald

---

[3]    Both the Summary and the Recommendation provide descriptions of the interviewed candidates, however, there are slight differences between them.  For instance, the Summary lists the skills required for the position, while the Recommendation does not, and although the general observations about each candidate are consistent, the language used is not identical.  In her deposition, Ms. Childs identified the Recommendation as the version given to her by Messrs. Larwood and Shryock during the application process. (Def.'s Mot., Ex. 21, Dep. Andria Childs [hereinafter "Childs Dep."] 34:8- 37:2.)  Indeed, the Recommendation is addressed to her, while the Summary is not addressed to anyone. The plaintiff claims that during arbitration, SSA submitted the Summary (rather than the Recommendation) as the document informing Ms. Childs's decision-making process, and that if SSA was correct in doing so, then Ms. Childs's deposition testimony could be undermined.  There is no need for this court to resolve what is essentially a dispute about the arbitration record.  Both the Summary and the Recommendation convey the same essential information about Mr. Jarvis and Mr. Sulewski, and the parties seem to agree that Ms. Childs had one of them before her when making her decision.  Furthermore, Ms. Childs testified that the most important factor in the decision to promote Mr. Sulewski was his mechanical background as opposed to Mr. Jarvis's focus on health and safety issues (Decl. Childs ¶ 8), a difference set forth in both the Summary and Recommendation.  Thus to the extent there is a dispute about which one was in fact used, it is immaterial.

4

is somewhat familiar with the procurement process; and has been involved in a variety of environmental and safety related projects throughout the complex, including the bird management program and some asbestos projects.  Additionally, Reggie has taken several procurement classes as well as an indoor air quality blue print reading class.  Mr. Jarvis has excellent computer skills.  He is both trained and comfortable with AutoCAD.  Reginald is familiar with the internal workings and processes, and employees within DMCM [Division of Main Complex Management].  He is a good communicator when he fully understands the subject matter and is familiar with his audience.  His computer skills enable him to write well. (Summary, Pl.'s Opp'n, Ex.5.)

In 1997 [,] Reginald was assigned to the Management and Safety Staff as a GS-7 Environmental Technician.  Since then, Mr. Jarvis has been promoted to a GS-11 Safety and Occupational Health Specialist (SOHS). He has extensive knowledge of the main complex and some understanding of the mechanical system throughout the complex.  Reginald is somewhat familiar with the procurement process; and has been involved in a variety of environmental and safety related projects throughout the complex, including the bird management program and some asbestos projects.  Reginald has good interpersonal communication skills.  Mr. Jarvis is computer proficient; and is both a capable writer as well as trained and comfortable in AutoCAD.  Mr. Jarvis is familiar with the processes and employees within DMCM.  This knowledge would enable him to eventually adapt to the position and become a valuable and active participant in the many on-going projects within DMCM.  (Recommendation, Def.'s Mot., Ex. 14.)

Christopher has been with Social Security, in the Plumbing Shop since 1991.  Over the last 11 years, Mr. Sulewski has been promoted from Pipe Fitter, to Maintenance Mechanic, and since 1997 has been the WL-10, Pipe Fitter Leader.  He has extensive knowledge of the main complex and completely understands the mechanical system within the complex.  As the Plumbing Shop leader, Chris has overseen his Shop's preventive maintenance program.  Chris has been involved in projects throughout the complex, including emergency water repairs, fire sprinkler installation and modifications and numerous repair and alteration projects.  Chris is a self-motivator, who has provided his knowledge on numerous projects to ensure their successful completion.  Additionally, Mr. Sulewski completed a 4-year pipefitting apprenticeship, and has taken Blue Print and Air Handler Operations and Maintenance classes; and has some procurement training.  Christopher has excellent computer skills.  He is both trained and comfortable with AutoCAD. Mr. Sulewski is very familiar with the internal workings and processes, and employees within DMCM.  He is a solid communicator and speaks with ease and confidence in any conversation.  As a leader, Chris has developed the skills and experience in motivating people he doesn't supervise; as well as gained experience in labor relations and personnel issues.  Combined with his conversation ability, his computer skills enable him to write well.  (Summary, Pl.'s Opp'n, Ex. 5.)

Chris has been with Social Security, in the Plumbing Shop since 1991.  Over the last 11 years, Chris has been promoted from Pipe Fitter, to Maintenance Mechanic, and since

1997 has been the WL-10, Pipe Fitter Leader. He has extensive knowledge of the main complex and completely understands the mechanical system within the complex. Chris knows the mechanical systems and internal workings of the headquarters complex the best of all the candidates. Chris has been involved in projects throughout the complex, including emergency water repairs, fire sprinkler installation and modifications and numerous repair and alteration projects. As a leader, Chris has developed the skills and experience in motivating people he doesn't supervise; as well as gained experience in labor relations and personnel issues. Shop and office personnel alike respect him. In the absence of the Shop Foreman, Chris has frequently acted in his stead. Chris is an effective communicator, frequently meeting with building occupants, facilities employees and lower management to discuss projects in various stages. He has provided his input on numerous projects to ensure their successful completion. Chris also is computer proficient. He is both a capable writer was [sic] well as trained and comfortable in AutoCAD. Mr. Sulewski is also familiar with the internal workings and processes, and employees within DMCM. This knowledge would enable him to quickly adapt to the position and become a valuable and active participant in the many on-going projects within DMCM. (Recommendation, Def.'s Mot., Ex. 14.)

Due to his perception of the tone of the interview[4] as well as the general lack of African Americans in building manager positions, Mr. Jarvis believed that his non-promotion was due to his race and brought a discrimination claim against SSA. His grievance first went to arbitration under the agreement between his union, American Federation of Government Employees, AFL-CIO, Local 1923 ("AFGE"), and SSA. Arbitration took place on May 19, 2004 and August 16,

---

[4] The plaintiff's testimony does not reference any remarks or conduct during the interview that appear overtly or even subtly racist; he only offers that he "felt very, very uncomfortable, and [he] knew that it [the interview] wasn't going to be good." (Def.'s Mot., Ex. 3.1, *In the Matter of AFGE v. SSA*, 105:19-106: 9, May 19, 2004 [hereinafter "Arb. Tr., Vol. 1"].) During the arbitration, Mr. Jarvis also stated that he had previously "walked up on him [Larwood] saying things he wasn't supposed to say, like telling jokes that shouldn't be said in the area . . . I walked into some pretty bad situations." (*Id.* at 104:4-11.) At one point in the arbitration, he referred explicitly to "racist jokes, ethnic jokes" being told, suggesting that Mr. Larwood's inappropriate jokes were of this variety. (*Id.* at 118:4-5.) Mr. Jarvis does not mention the alleged jokes in his opposition brief, nor attribute any racist remark to Ms. Childs. Furthermore, "[s]tray remarks by employees do not demonstrate an employer's intent to discriminate, even when the decision-maker consults with those employees in reaching his decision." *Farasat v. Paulikas*, 32 F. Supp. 2d 249, 257 (D. Md. 1998) (citing *Vakharia v. Little Co. of Mary Hosp.*, 917 F. Supp. 1282, 1295 (N.D. Ill. 1996)).

2004, during which time arbitrator Michael Fischetti ("arbitrator") heard from the plaintiff as well as witnesses for both sides.  SSA's position, presented largely through the testimony of Messrs. Larwood and Shryock, but notably not Ms. Childs, who had retired, was that Mr. Sulewski was more qualified for the job than Mr. Jarvis based on his background in mechanical or "shop" experience and his performance in the interview.  (*See*, *e.g.*, Def.'s Mot., Ex. 3.1, *In the Matter of AFGE v. SSA*, 181:13-182:8,  May 19, 2004 [hereinafter "Arb. Tr., Vol. 1"]; Ex. 3.2, *In the Matter of AFGE v. SSA*, 98:4- 104:16, Aug. 16, 2004 [hereinafter "Arb. Tr., Vol. 2"]) (samples of Mr. Shryock's and Mr. Larwood's testimonies respectively).

       The arbitrator found for SSA on October 19, 2004, but concluded that the interviewers, particularly Mr. Larwood, gave Mr. Sulewski preferential treatment, writing him a "favorable review which could not be documented either through testimony or the written evidence." (Def.'s Mot., Ex. 16, *In the Matter of Arbitration Between AFGE and SSA*, Report, 21, 23 (Oct. 19, 2004) (Fischetti, Arb.) [hereinafter "Arb. Report"].)  The arbitrator was concerned that "[i]f Ms. Childs relied heavily upon the summary evaluations in making her selection for the position, then she relied upon information that was possibly false or at least inaccurate." (*Id.* at 20.)  He concluded, however, that "the record has not demonstrated that the favoritism showed to Mr. Sulewski provided a nexus for the claim of racial discrimination." (*Id.* at 23.)  In reaching his decision, the arbitrator also gave weight to Mr. Jarvis's otherwise positive employment experience at SSA, as shown by his rapid promotions, and the fact that Mr. Jarvis had not occupied his GS-11 position for as long as many others who were made building managers.  (*Id.* at 21.)  The arbitrator was nonetheless adamant that SSA scrutinize the situation of minority representation at the building manager level and consider making it a position in which minority

7

status would be a factor in hiring. (*Id.* at 23-24.)

Following the arbitrator's denial of his grievance, Mr. Jarvis appealed to the Equal Employment Opportunity Commission ("EEOC"), which affirmed the arbitrator's decision on July 28, 2005, concluding that the "grievant failed to present sufficient evidence establishing that his qualifications were plainly superior to those of the selectee or any other persuasive evidence that the agency's legitimate, nondiscriminatory reason for grievant's non-selection was pretext for discrimination." (Def.'s Mot. Dismiss or Summ. J., Ex. 17, *Jarvis v. Barnhart*, 2005 EEOPUB LEXIS 3613, *2 (July 28, 2005) [hereinafter "EEOC Report"].) Having thus exhausted his administrative remedies, Mr. Jarvis properly filed the current case in this court on October 28, 2005. The defendant filed a motion to dismiss or alternatively for summary judgment on June 27, 2006, and the plaintiff filed a cross-motion for partial summary judgment on the issue of liability or alternatively for time for discovery prior to ruling on summary judgment on July 14, 2006. In an order dated November 30, 2006, the court denied without prejudice the defendant's motion and the plaintiff's request for summary judgment on liability; the plaintiff was granted time for additional discovery, limited to the deposition of Ms. Childs. Following this deposition, the defendant renewed his request for summary judgment on February 20, 2007.

## ANALYSIS

*Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law.

The Supreme Court has clarified this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club*, *Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

*Burden-Shifting Framework*

The plaintiff does not offer any direct evidence that he was subject to racially motivated disparate treatment, thus the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. Three steps are required to establish discriminatory treatment under this framework: first, the plaintiff must establish a *prima facie* case of

9

discrimination; second, the Commissioner bears the burden of giving "'a legitimate nondiscriminatory reason'" for his decision; third, the burden shifts back to Mr. Jarvis to show that the reasons asserted were a pretext for discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations omitted). This shifting burden is one of production only; at all points the burden of persuasion remains with the plaintiff. *See Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981). The parties easily satisfy their respective burdens at stages one and two of the burden-shifting framework, however, the plaintiff fails to do so at the third stage.

To establish a *prima facie* claim of non-promotion due to racial discrimination, the plaintiff must show that "(1) [he] is a member of a protected group, (2) [he] applied for the position in question, (3) [he] was qualified for that position, and (4) the defendants rejected [his] application under circumstances that give rise to an inference of unlawful discrimination." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005), *cert. denied*, 126 S.Ct. 1431 (2006) (internal citations omitted). *See generally McDonnell Douglas Corp.*, 411 U.S. at 802 (establishing the basic requirements for a *prima facie* claim of racial discrimination under Title VII). As Mr. Astrue concedes for the purposes of this motion, Mr. Jarvis has satisfied these four requirements and stated a *prima facie* claim. (Def.'s Mot. at 2.)

Mr. Astrue next must explain the decision to promote Mr. Sulewski rather than Mr. Jarvis with reference to legitimate, nondiscriminatory factors. *Burdine,* 450 U.S. at 254; *see also Westinghouse*, 406 F.3d at 268; *Amirmokri v. Balt. Gas and Elec. Co.*, 60 F.3d 1126, 1129 (4th Cir. 1995). Such a showing may be made with reference either to reasons for rejecting Mr. Jarvis or choosing Mr. Sulewski. Mr. Astrue is not required to provide both types of reasons,

nor must he "persuade the court that [he] was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254 (citing *Board of Trustees of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 (1978)).

As Mr. Jarvis concedes, the defendant provides legitimate, nondiscriminatory reasons supported by admissible evidence both for rejecting him and for preferring Mr. Sulewski. (Pl.'s Opp'n at 17.) Ms. Childs's declaration sets forth the rationale for the choice: "Mr. Jarvis was a Safety and Occupational Health Specialist. His experience was limited to health and safety issues. In contrast, Mr. Sulewski was a Pipe-Fitter/Plumber and, as a result, had broader experience in the mechanical operations and infrastructure of HQ [headquarters] buildings." (Decl. Childs ¶ 8.) Her deposition testimony reinforces the centrality of the candidates' respective technical capacities to her decision that "Mr. Sulewski was the more qualified individual, [because he] had the– the [sic] experience that was needed for the position." (Childs Dep. 59:8-12; *see also id.* at 40:9-15, 42:13-43:4, 59:4-61:5.) Thus the decision-maker to whom the Commissioner delegated the promotion decision explains both her rejection of Mr. Jarvis and her preference for Mr. Sulewski with reference to valid and neutral employment criteria related to the building manager position. *See Amirmokri*, 60 F.3d at 1130 (citing, *inter alia*, *Burdine*, 450 U.S. at 258-59) (stating that when making a promotion decision, an employer may consider both subjective and objective factors related to the job in consideration).

Since the defendant has met his burden of production, the third step requires the plaintiff to show pretext; that is, to "demonstrate that the proffered reason was not the true reason for the employment decision." *Burdine*, 450 U.S. at 256; *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989) (stating that the preponderance of the evidence standard applies to

11

the plaintiff's burden of proof). The plaintiff must show pretext either "directly by persuading the court that a discriminatory reason more likely motivated employer or indirectly by showing that employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256 (citing *McDonnell Douglas*, 411 U.S. at 804-05). Indirect persuasion, the means relied upon by Mr. Jarvis, can take the form either of showing that the plaintiff "was the better qualified candidate for the position sought," or that the employer's stated reasons were false and discrimination may be inferred. *Westinghouse*, 406 F.3d at 269 (citing, *inter alia*, *Evans v. Techs. Applications & Service Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (explaining the better-qualified test)).[5] Mr. Jarvis has failed to use either of these methods successfully.

*Better Qualified Approach*

To succeed under the theory he was better qualified for the position than Mr. Sulewski, the plaintiff must demonstrate that his "qualifications were so plainly superior that the employer could not have preferred another candidate." *Columbia Colleton Med. Ctr., Inc.*, 290 F.3d at 648 n.4. In an attempt to satisfy this standard,[6] Mr. Jarvis goes through each section of the initial written application and compares his responses and the scores he received to Mr. Sulewski's. (Pl.'s Opp'n at 31-34.) That Mr. Jarvis's overall score on this initial evaluation was higher does not establish plain superiority; it shows only that he performed better in the initial part of the

---

[5] Contrary to the Commissioner's presentation of this material, the "better qualified" test is not the only means of proving pretext. The Fourth Circuit explicitly rejected this limitation in *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 648 n.4 (4th Cir. 2002), in light of the Supreme Court's decision in *Reeves*, 530 U.S. at 147 (explaining that a court may infer discrimination based on an employer's untruthful explanation for an employment decision).

[6] In his opposition memo, Mr. Jarvis characterizes his qualification-based argument as applying the false reasoning approach, however, it is more accurately understood as support for the position that he was better qualified than Mr. Sulewski.

two-step application process than Mr. Sulewski did. The opportunity remained for Mr. Sulewski to demonstrate his equal or greater fitness for the position during the interview phase. The defendant has offered uncontradicted evidence– in the form of the interview notes, the evaluations, and Mr. Shryock's declaration (*see* Decl. Shryock ¶ 5)– that Mr. Sulewski in fact did outperform Mr. Jarvis during the interview stage.

*False Reasoning Approach*

Under the false reasoning approach, the plaintiff must "provide evidence that the employer's proffered reason was not the actual reason relied on, but was rather a false description of its reasoning– albeit one based on a real difference in qualifications– manufactured after the fact." *Columbia Colleton Med. Ctr.*, *Inc.*, 290 F.3d at 648 n.4. This demonstration of pretext, coupled with the *prima facie* case, "may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148. Mr. Jarvis submits that there are two ways in which a jury could so find in this case.

First, Mr. Jarvis contends that the Commissioner, through Ms. Childs's declaration and subsequent deposition, now explains the employment decision in a way that not only differs from but is incompatible with the rationale advanced during arbitration. According to the plaintiff, the defendant initially focused on communication skills, as exhibited through interview performance, as the deciding factor, then shifted to reliance on the different work backgrounds of the candidates. (*See* Pl.'s Opp'n at 23, 25) (arguing that "[a] person with great communication skills but ignorant of the SSA buildings could be selected under the arbitration rationale," whereas the "new rationale" would permit selection of someone with "broad experience in mechanical operations and great knowledge of the buildings" who had poor communication

13

skills). This argument is not persuasive. The defendant, through various representatives in different contexts– the arbitration testimony, the declarations of Messrs. Larwood and Shryock, the declaration and deposition of Ms. Childs– has consistently cited interview performance in his explanation for promoting Mr. Sulewski, and at no point has successful performance been equated solely with communication skills. In addition to assessing candidates' communication skills, the interviews were designed to assess the relevant knowledge candidates had accumulated by virtue of their previous job experience. These two factors were seen as complementary, with the ideal candidate possessing both relevant knowledge and the ability to convey that knowledge to others as needed.

For instance, during the arbitration, Mr. Shryock testified that the objective of the interview questions was to assess how much knowledge the candidates had about systems within the building and the appropriate means of maintaining them as well as dealing with any problems that might arise. (*See* Arb. Tr., Vol. I ,168:14-178:12.) SSA wanted to promote "the best possible person that had the most knowledge that could hit the ground running," and these questions were designed to find that person. (*Id.* at 178:8-9.) Thus the conclusion that Mr. Jarvis was not among the top performers in the interview phase of the application process was based on the fact that those who out-performed him

> answered the questions a little more concisely, and [were] a little more knowledgeable about the position . . . [some of] the applicants were shop personnel who deal with the PM [preventive maintenance] program, who deal with a lot of the day to day operations of the building type of thing, so they did have a little more knowledge of what we wanted when we asked the questions.

(*Id.* at 181:13-182:8.)

Ms. Childs also describes the candidates' interview performance as informing the

decision she ultimately made to promote Mr. Sulewski.  (*See* Decl. Childs ¶¶ 3, 4, 5, 7) (mentioning interviews).  She states that candidates' responses "were useful in clarifying and/or gathering additional information on each candidates [sic] experience level." (*Id.* at ¶ 3.)  This was the interview's most significant value in her mind, but not to the exclusion of also providing an opportunity to assess communication skills.  She explains that "communication skills are important [for the building manager position], but they are not– I think technical skills and knowledge are– from– from [sic] my perspective were more critical than communication skills." (Childs Dep. 40:10-15.)  Her explanation of the role of the interviews is thus consistent with that given by Mr. Shryock during the arbitration: the interviews were useful for demonstrating candidates' relevant experience and communication skills, both central factors in filling the position.

     Ms. Childs admits that she and Mr. Shryock may have differed over which factor they thought was most important– he thought communication skills were more primary than she did (Childs Dep. 69:15-70:1)– but this variation does not suggest pretext.  Both factors have consistently been advanced by SSA; that they were given slightly different weight in the descriptions of SSA representatives at different times does not indicate a transformation of SSA's professed rationale from the arbitration to the current litigation.  Furthermore, as the plaintiff himself urged in his initial Rule 56(f) motion, the best (and perhaps only) person in the position to explain the rationale for the employment action is the decision-maker herself, Ms. Childs.  (*See also* Childs Dep. 70:14-19 (stating that she was the selecting official, thus she was free to act without adopting Mr. Shryock's position).)  She has now done so, through a declaration and a deposition, and her explanation has provided the necessary insight into the

decision without representing a departure from the general information provided previously by her subordinates.

Second, the plaintiff argues that "[i]t is possible that the jury will credit defendant's earlier arguments to the effect that Ms. Childs's reasons for the selection can be inferred from the reasons given by Mr. Shryock and Mr. Larwood in recommending Mr. Sulewski." (Pl.'s Opp'n at 27.) That is, if Ms. Childs is viewed as having "rubber-stamped" the preference of Messrs. Larwood and Shryock for Mr. Sulewski, without having given the matter independent consideration, any discriminatory motives that could be inferred from inconsistencies or fabrications in the materials they prepared recommending Mr. Sulewski could be attributable to her. It is not necessary to decide if this argument is sound as a matter of law because the defendant does not now advance anyone else's explanation or materials as proof of Ms. Childs's decision-making process. He has offered uncontroverted evidence that she alone made the actual decision. (*See* Childs Dep. 70:14-19, 77:5-78:11.) In so doing, she considered the application materials submitted by the candidates, as well as their responses to interview questions and the evaluation prepared by Messrs. Larwood and Shryock. (Decl. Childs ¶ 3.) She also relied upon her personal knowledge of the applicants (Childs Dep. 45:3-15), which included having observed Mr. Sulewski deal with a facilities related emergency, assuming leadership in the absence of a supervisor (*Id.* at 61:18-62:11). The evaluation thus was one of several factors influencing what was ultimately her decision.

To the extent that fabrications or inconsistencies have been identified in the materials prepared by Messrs. Larwood and Shryock, they do not relate to the primary factor upon which uncontroverted evidence shows the decision to have been based: relevant employment

16

experience. The arbitrator found that Larwood and Shryock somewhat exaggerated Mr. Sulewski's qualifications in the areas of contracts, writing, procurement training, and possibly leadership experience in the summaries they gave Ms. Childs. (Pl.'s Opp'n at 28-30.)[7] Such behavior is not appropriate, however, as none of these areas were central to Ms. Childs's decision-making process, any inflation or inaccuracy contained within them would not suffice to raise an inference of discrimination that could somehow attach to the decision-maker herself. *Cf. Reeves*, 530 U.S. at 149 (considering "the probative value of the proof that the employer's explanation is false" a legitimate factor in deciding a motion for judgment as a matter of law).

"While courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Evans*, 80 F.3d at 958-59 (citing *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987)). Since the plaintiff has failed to forecast evidence sufficient to permit a jury to infer that the defendant's justifications for rejecting him and preferring Mr. Sulewski were pretextual, the plaintiff has not met his "ultimate burden" of persuasion with respect to the defendant's discriminatory intent. *Burdine*, 450 U.S. at 253 (internal citations omitted).

*Time for Additional Discovery*

---

[7] I am not considering other "false statements" identified by the plaintiff regarding criteria development or Mr. Larwood's presence on the assessment panel (Pl.'s Opp'n at 28-30) because they are at most tenuously linked to the substance of the information Messrs. Larwood and Shryock provided to Ms. Childs. The plaintiff also characterizes Mr. Larwood's statement during arbitration that building managers generally come from the shops as somehow rendered false by his subsequent admission that he had a background similar to Mr. Jarvis's before becoming a building manager. (*Id.* at 30.) This exchange relates to Mr. Larwood's employment history and is not probative of Ms. Childs's evaluation of and subsequent decision regarding the specific candidates applying for the promotion at issue in this case.

Perhaps cognizant of his inability to satisfy this burden, the thrust of the plaintiff's opposition to the defendant's motion for summary judgment is a request for time for additional discovery under Fed. R. Civ. P. 56(f). Such a request should be granted when the party opposing summary judgment "has not had the opportunity to discover information that is essential to his opposition." *Liberty Lobby*, *Inc.*, 477 U.S. at 250 n.5. Furthermore, this party must have "'focused [the Court's] attention on an affidavit . . . that particularly specifies legitimate needs for further discovery.'" *Morrow v. Farrell*, 187 F. Supp. 2d 548, 551 (D. Md. 2002) (quoting *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995)). A convincing Rule 56(f) affidavit contains specific and detailed information about the proposed discovery clearly linking it to the elements necessary for an effective opposition. *See*, *e.g.*, *Fairclough v. Bd. of County Comm'rs of St. Mary's County*, *Md.*, 244 F. Supp. 2d 581, 586 (D. Md. 2003) (granting further time for discovery in a Title VII case upon affidavit identifying specific items, such as a calendar, that plaintiff credibly explains would help prove pretext). It is appropriate to deny a request for additional time when the party asking for it did "not specifically allege why the information sought would have been sufficient to create a genuine issue of material fact such that it would have defeated summary judgment." *Strag v. Bd. of Trs.*, *Craven Comm. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Karim v. Staples*, *Inc.*, 210 F. Supp. 2d 737, 739 (D. Md. 2002) (stating that "unsupported, conclusory assertions" do not reach the level necessary to grant additional time for discovery) (citing, *inter alia*, *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 (5th Cir. 1990)).

The plaintiff submits two affidavits in support of his Rule 56(f) request: one from him (Pl.'s Opp'n, Ex. 9, Supp. Decl. Reginald Jarvis [hereinafter "Jarvis Supp. Decl."]), the other

from his counsel (Pl.'s Opp'n, Ex. 8, Decl. Phillip R. Kete [hereinafter "Kete Decl."]). The plaintiff's affidavit states that he needs to take the depositions of Mr. Larwood, Mr. Shryock, and various other individuals, as well as obtain certain records, in order (1) to obtain information related to Mr. Larwood's role, if any, in developing the assessment criteria (Jarvis Supp. Decl. ¶ 4); (2) to determine what basis there was for the high evaluation of Mr. Sulewski's writing abilities (*id.* at ¶ 5); (3) to determine what justification there was for Mr. Larwood's statement that Mr. Jarvis's non-shop background was a disadvantage (*id.* at ¶ 6);[8] and (4) to learn why Mr. Shryock was not asked to serve as the recommending official for the position (*id.* at ¶ 11).[9] As discussed above, none of these issues are probative of the decision-maker's rationale for the employment action, thus they do not give rise to areas in which discovery would lead to material facts sufficient to defeat summary judgment. *See generally Strag*, 55 F.3d at 954.

The plaintiff also maintains that regardless of his ability to satisfy Rule 56(f) standards, under *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002), he is "entitled to a reasonable

---

[8] Mr. Larwood's background demonstrates that not all building managers come from the "shop", and that those with other backgrounds are able to fill the position satisfactorily. This was already clear from SSA's selection process: all of the candidates on the well-qualified list were deemed to have met the basic criteria for the job. Mr. Jarvis's non-shop background did not render him unqualified, thus it follows that Mr. Larwood's would not have either. SSA is free to choose from among qualified candidates with respect to non-discriminatory variables. *See Evans*, 80 F.3d at 960 (explaining that "'the employer has discretion to choose among equally qualified candidates provided the decision is not based upon unlawful criteria.'") (citing *Wileman v. Frank*, 979 F.2d 30, 38 (4th Cir. 1992)).

[9] Counsel's affidavit notes that the other parts of the plaintiff's affidavit relate to the need to depose Ms. Childs, which has already happened, thus they are no longer relevant. (Kete Decl. ¶ 3.) It also sets forth the dispute about whether the interview notes came into the arbitration record and which version of the evaluations (Summary or Recommendation) was introduced during arbitration. (*Id.* at ¶¶ 4-7.) As discussed above, there is no need for this court to resolve a dispute about the arbitration record, especially in light of the fact that the arbitration exhibits have not been provided to the court.

amount of discovery to search for it [direct evidence of discrimination]". (Pl.'s Opp'n at 17.) *Swierkiewicz* did not create a special "right to discovery" for Title VII plaintiffs but held that such plaintiffs should not face a heightened pleading standard whereby they had to set forth a prima facie case of discrimination in their complaint, in part because "discovery might uncover . . . direct evidence" such that the burden-shifting framework would not apply. 545 U.S. at 510-12. Mr. Jarvis is thus not entitled to additional time for discovery, and summary judgment will be granted for the defendant at this time.

A separate order follows.

   July 31, 2007                                                    /s/
      Date                                               Catherine C. Blake
                                                      United States District Judge